UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim No. 11-204 (SRN/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| MAURICIO FRANCO-MARTINEZ, | |
| Defendant. | |

---

The above matter came before the Court upon the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure and Motion to Suppress Statements, Admissions and Answers. The Motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons that follow, it is recommended that the Defendant's Motion to Suppress Statements, Admissions and Answers be granted in part and denied in part, and that his Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

## I.     BACKGROUND

On June 21, 2011, Defendant Mauricio Franco-Martinez was indicted on one count of unlawful reentry after removal in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2), and 6 U.S.C. §§ 202 and 557. The following factual findings are based upon the testimony offered at the evidentiary hearing that was held on July 26, 2011, at which time the Government called three

witnesses: Minnesota State Trooper Peter Goman, U.S. Border Patrol Agent Julio Mendez, and U.S. Border Patrol Agent Brandon Tracey.[1]

Around 10:00 p.m. on June 1, 2011, Minnesota State Trooper Peter Goman was patrolling in an unmarked squad car on northbound Minnesota Highway 53 between Eveleth and Virginia, Minnesota. Goman observed a vehicle approaching his squad car from behind at a high rate of speed, which appeared to exceed the posted speed limit of 55 miles per hour. Goman activated his radar, which indicated that that the vehicle was travelling at a speed of approximately 62 to 65 miles per hour. As the vehicle passed his squad car, Goman observed that the passenger was not wearing his seat belt. Goman again activated his radar confirming that the vehicle was travelling at or around 65 miles per hour. Goman then pulled his squad in behind the vehicle and observed that neither the driver nor the passenger appeared to be wearing their seat belts. Goman then activated his emergency lights in order to execute a traffic stop, and the vehicle immediately pulled over to the right shoulder and stopped.

Goman approached the vehicle on the driver's side and observed that neither occupant of the vehicle was wearing a seat belt. Goman first approached the driver of the vehicle and explained that he had initiated the traffic stop because the vehicle's speed had exceeded the posted speed limit and the occupants were not wearing seat belts. Goman then attempted to identify the occupants of the vehicle. He was able to identify the driver of the vehicle, and he

---

[1] Agent Mendez and Agent Tracey testified that they are also immigration officers, and therefore, they are empowered by statute to conduct immigration investigations and to arrest aliens who are believed to be in the country without lawful permission. See, 8 U.S.C. § 1357.

issued a citation for no seat belt and a warning for speeding.[2] Goman acknowledged that a seat belt violation is not an arrestable offense.

Goman then attempted to identify the passenger because he was also going to issue a citation for no seat belt to the passenger. However, the passenger, who was identified at the hearing as the Defendant, was unable to produce any kind of identification. As such, Goman then attempted to identify the Defendant by name and date of birth. Goman testified that the Defendant was unable to speak fluent English, and that his first language appeared to be Spanish. Goman does not speak Spanish, but Goman testified that the Defendant appeared able to generally understand what he was saying and was able to answer in broken English.

The Defendant initially provided a date of birth and the name of Mauricio Franco. Goman testified that he asked the Defendant whether he had a Minnesota identification, but he was unable to get a clear answer to this question from the Defendant. Goman then asked the Defendant if he had lived in any other state, and the Defendant indicated that he had also lived in Texas and Colorado. Goman then returned to his squad and ran the name and date of birth provided by the Defendant in all three potential states of residence identified by the Defendant. Goman received no results from this search and as such, he was unable to verify the Defendant's identity.

Goman re-approached the vehicle, and during this interaction, the Defendant gave the name Mauricio Franco Menendez. Goman then returned to his squad and checked all of this information in Minnesota, Colorado, and Texas, and again received no information.

---

[2] The driver was a white male who spoke fluent English. The driver and the Defendant, who both worked for a contractor, were on their way to perform maintenance work at a Target store in Virginia, Minnesota, at the time of the traffic stop.

3

Goman approached the vehicle a third time. At that point, the driver reported that he was speaking to the Defendant's girlfriend on his cell phone. Goman spoke with the woman on the phone, and she provided the same date of birth and the name Mauricio Franco Martinez. The woman also indicated that she had some type of paperwork that would identify who the Defendant was at her home.

Given the communication difficulties, Goman attempted to obtain assistance from local law enforcement agencies, but there were no officers on duty who spoke Spanish. Goman then contacted the United States Border Patrol for assistance with translation. Goman was connected with Border Patrol Agent Matt Wilder. Goman gave Agent Wilder the date of birth and the three names that had been provided. After running this information, Wilder called Goman back and indicated that they found no record of this individual in their database. Wilder then requested that Goman detain the Defendant for further investigation and also requested to speak with the Defendant via cell phone. Accordingly, Goman escorted the Defendant from the vehicle and placed him in the back of his squad car. Goman estimated that at this point, it had been approximately 20 to 25 minutes since he had initiated the traffic stop.

While the Defendant was locked in the back of the squad car, Goman put him on the phone with Agent Wilder. After about five minutes, Border Patrol Agent Julio Mendez took over the conversation with the Defendant because he possessed far greater proficiency in Spanish. Mendez testified that neither he nor Agent Wilder read the Defendant his <u>Miranda</u> rights because, at that point, they were only obtaining his biographical data. Agent Mendez asked the Defendant for his biographical data, including his name, date of birth, where he was born, and whether he had any legal status in the United States. The Defendant stated that he was a lawfully admitted permanent resident (LAPR). Mendez believed that the Defendant was lying

4

because any person who had petitioned for status in the United States would appear in the Border Patrol's databases. Based on his experience, Mendez believed that the Defendant was in the United States illegally. Mendez testified that it is a misdemeanor for a LAPR not to carry identification indicating their status.

Goman cited the Defendant for failure to wear a seat belt and further cited him for providing a false name to a police officer, given his belief that the Defendant had not provided an accurate name. After Mendez' conversation with the Defendant, Wilder again asked Goman to detain the Defendant pending further investigation of his identity, and arrangements were made for transporting the Defendant to the Border Patrol Station in Duluth, Minnesota.

Agent Wilder met Goman for the transfer and transported the Defendant to the Duluth Border Patrol station. Upon arrival at the station, Wilder indicated that he believed that the Defendant might have given a false name and that he was likely in the United States illegally, since the normal database checks had failed to produce any results. Border Patrol Agent Brandon Tracey testified that their suspicions that the Defendant was in the country illegally were heightened by the fact that the Defendant had what appeared to be gang tattoos on his body.

Shortly after his arrival, the agents once again asked for the Defendant's name and date of birth, and they also obtained the Defendant's fingerprints. While the system was running the fingerprints, which took up to 2 hours, the Defendant spent some time waiting in the office and in a holding cell. The Defendant was not questioned while they were waiting for results.

Agent Tracey testified that the results from the fingerprint indicated that the Defendant had used multiple aliases and that he had an extensive criminal background. Tracey immediately read the Defendant his <u>Miranda</u> rights given the possibility that the Defendant could be

prosecuted for immigration violations. Tracey testified that he read the Defendant his rights in English, and also gave him a copy to read in both English and Spanish. Tracey also gave the Defendant a list of phone numbers that he could call in order to obtain an attorney at no charge. The Defendant indicated that he understood his Miranda rights. Tracey testified that at no time did the Defendant ask for an attorney, he never said that he did not want to talk or answer questions, and he never asked to terminate the interview. In addition, Tracey testified that the Defendant was not threatened during the course of the interview, and that the Defendant was cooperative, polite, and calm.

## II.   DISCUSSION

The Defendant argues that he was taken into custody in violation of his Fourth Amendment rights, and therefore, that all evidence obtained after that point, including the fingerprints, the database match, the Defendant's post-Miranda statements, should be suppressed. He further argues that the Defendant's telephonic statement at the scene of the traffic stop was obtain in violation of his Fifth Amendment rights.

### A.   The Traffic Stop

As a threshold matter, the Court notes that the Defendant does not contend that the initial traffic stop for speeding and seat belt violations violated the Constitution. It is well-established "that **any** traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001)[citations omitted]. Goman observed that the vehicle was speeding and that the occupants were not wearing seat belts in violation of state traffic laws, and therefore, there was probable cause for the traffic stop. Accordingly, the traffic stop was clearly lawful.

Having made a valid traffic stop, an officer may conduct a reasonable investigation, which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995), cert. denied, 516 U.S. 936 (1995)(quoting United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)).  An officer may undertake similar questioning of the vehicle occupants. Johnson, 58 F.3d at 357.

Here, Goman's initial questioning of the Defendant was reasonable and appropriate and directed towards the legitimate purpose of issuing a citation for failure to wear a seat belt. Goman simply asked for the Defendant's identification, and when the Defendant was unable to produce such identification, he asked for the Defendant's name and date of birth, which he then attempted to confirm by running computer searches of the information that the Defendant had provided. See United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999)("having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning"); United States v. Jones, 269 F.3d 919, 924-25 (8th Cir. 2001)(the officer was permitted to "request [the defendant's] driver's license and registration  . . . conduct computer searches to investigate the driver's" history as long as reasonably necessary to conduct these activities and to issue a warning or citation)

"When there are complications in carrying out the traffic-related purposes of the stop . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)(citing United States v.

7

Sharpe, 470 U.S. 675, 685-87 (1985)). "An officer may expand the scope of the traffic stop if 'reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out,' both of which might raise an officer's suspicion." United States v. Mendoza-Carrillo, 107 F.Supp.2d 1098, 1102 (D.S.D. 2000)(quoting United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)). In determining whether a stop lasted no longer than necessary, "we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." United States v. Dickson, 58 F.3d 1258, 1263 (8th Cir. 1995)[citation omitted], cert. denied, 516 U.S. 1064 (1996).

      The Court finds that Goman's inquiries regarding the Defendant's identity were within the proper scope of a lawful investigative stop. After Goman was unable to verify the information provided for Defendant, he was clearly justified in attempting to seek additional information regarding the Defendant's identity. The Defendant does not dispute that Goman was entitled to issue him a citation for failure to wear a seatbelt, and Goman needed to accurately identify who the Defendant was in order to complete the citation. When none of Goman's initial interactions with the Defendant produced a positive identification, he was justified in prolonging the traffic stop in order to seek the assistance of a Spanish-speaking officer. Cf., United States v. Cloud, 594 F.3d 1042, 1045 (8th Cir. 2010)("a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification.") Moreover, the Court does not believe that the traffic stop was prolonged by an excessive or unreasonable amount of time while Goman sought to verify the Defendant's identity, particularly in light of the communication barriers that existed. According to Goman's testimony, about 20 to 25 minutes had elapsed since he pulled over the vehicle to when the Defendant was detained at the request of Border Patrol Agents. See United States v. Tuley, 161

F.3d 513, 515 (8th Cir. 1998)(twenty minute stop for purposes of determining the defendant's identity and his purpose for being at the location was within the scope of a lawful investigative stop).  There is simply no reason for concluding that his detention was unreasonably prolonged by Goman's investigation of the Defendant's identity, including the call he made to Border Patrol seeking their assistance.  As such, the Court finds that the Defendant was not illegally detained during the course of the traffic stop.

Moving to his statement at the scene, it is undisputed that the Defendant did not receive a Miranda warning before he was first questioned by Border Patrol agents over the phone.  The Defendant argues that his first statement should be suppressed because it was tantamount to custodial interrogation and therefore, the agents questioning him were required to provide him with a Miranda warning.

"Under Miranda, the government is prohibited from using statements made during custodial interrogation unless the defendant has been previously advised of his Fifth Amendment privilege against compulsory self incrimination and right to an attorney."  United States v. Lockett, 393 F.3d 834, 837 (8th Cir. 2005), cert. denied, 546 U.S. 1198 (2006) (citing Miranda v. Arizona, 384 U.S. 436 (1966)).  Whether or not a suspect has been formally arrested is not determinative: "[i]f [the defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the defendant] was being held in custody during the interrogation."  United States v. Griffin, 922 F.2d. 1343, 1347 (8th Cir. 1990).

As an initial matter, the Court must resolve a factual dispute over where the Defendant was located when he first spoke to Border Patrol Agents over Goman's cell phone.  The

9

Defendant asserts that his first statement took place while he was locked in the back of the squad car. The Government disputes this, contending that the Defendant was still in the stopped vehicle at the time he made the statement. As relevant here, on cross-examination Goman testified as follows:

> Q: And then the border patrol officer talked with [the Defendant] over the phone?
>
> A: My first conversation with the border patrol was to relay my request and to relay the information that I had at the time, and they took that information and they called me back again a few minutes later, ten minutes later, I don't recall exactly what the time delay was in there.
>
> Q: Okay, so the border patrol agent did not talk to Mr. Franco Martinez over the phone at that point in the time?
>
> A: Not on the initial conversation, no.
>
> * * *
>
> Q: And then with the information you provided the border patrol agent, he asked that you detain him, right?
>
> A: Yes sir.
>
> Q: And at that point in time he was not free to leave, right?
>
> A: That is correct.
>
> * * *
>
> Q: And then did you end up escorting him out of Mr. Peterson's car and then bringing him back to your squad car at that point in time?
>
> A: Yes sir.
>
> Q: And then, after that, he stayed with you in your squad car until he was turned over to the border patrol, right?
>
> A: That is correct.
>
> Q. Was he in the back of your squad car?'
>
> A: Yes sir.

> Q: The doors were locked, right?
>
> A: That is correct.
>
> Q: And then was there some subsequent conversation that took place over the cell phone **while he was in the back of your squad car**?
>
> A: **Yes**, he had, again as I testified before, he had a five or ten minute conversation with the border patrol agent on my cell phone.

[emphasis supplied]. Contrary to the Government's argument, the Court finds that based on Goman's testimony it is clear the Defendant's first statement was obtained while he was locked in the back of the squad car. The testimony reflects that the Defendant was placed in Goman's squad car after the Border Patrol requested that Goman detain him after it first received no results when running a computer data base search of the biographical information the Defendant had provided.

The Government next argues that, even if the Defendant was locked in the squad car at the time he made his statement, he was not in custody for purposes of <u>Miranda</u>. In general, "the full panoply of protections prescribed by <u>Miranda</u> does not apply during the course of a traffic stop where the motorist is not subjected to the functional equivalent of formal arrest." <u>United States v. Martin</u>, 411 F.3d 998, 1003 (8th Cir. 2005)(citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440-42 (1984)). However, a suspect will be subject to custodial interrogation, and therefore entitled to the protections of <u>Miranda</u>, where "a reasonable person in [defendant's] position would [not feel] at liberty to end the interrogation and leave." <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1038–39 (8th Cir.2005)[citations omitted]. A court looks at the totality of the circumstances at the time of questioning to determine whether a defendant was in custody. <u>United States v. Czichray</u>, 378 F.3d 822, 826 (8th Cir.2004), <u>cert. denied</u>, 544 U.S. 1060 (2005), (citing <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir.2002)). "Factors useful in

considering whether custody is involved are whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with authorities, whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning." United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996), (citing Griffin, 922 F.2d at 1348).

The Court finds that a reasonable person in the Defendant's situation would have felt that he was in custody when he was first questioned by Border Patrol agents over the phone. The Defendant was not given the choice to sit in the squad car, but rather, he was placed there at the direction of Trooper Goman. Although the Defendant was not handcuffed, he was placed in the back of a locked squad car which the Court finds weighs heavily in favor of a finding that the Defendant was in custody. Moreover, there is no indication that the Defendant was told that he did not have to answer the questions, that he was free to leave, or that he was not under arrest. Goman testified that the Defendant was not free to leave, and even before the telephonic interview, the intention was to continue the Defendant's detention pending further investigation of his identity. The Defendant was not released after the interview was complete.[3] Given these facts, the Court finds that the Defendant was in custody for purposes of Miranda when he was first telephonically questioned by Border Patrol Agents.[4]

---

[3] The Government emphasizes that the Border Patrol agents did not know that the Defendant was in the locked squad car. The Court finds this irrelevant, as it is the Defendant's point of view that governs the custodial determination.

[4] The Government has cited United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995) for the proposition that being held in a squad car during questioning does not necessarily mean that the suspect was subject to custodial interrogation. Being placed in a squad car is but one of many factors that must be considered, and the Court finds that the present case is clearly

The Court recognizes that, in general, "[a] request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating." United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996)(quoting United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985)); see also, United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1038 (8th Cir. 2010)[citing cases]("asking a routine booking question is not interrogation under Miranda.") "Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny." Brown, 101 F.3d at 1274. However, "even routine questioning may amount to interrogation. Thus, while there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal alien." United States v.Aragon-Ruiz, 551 F.Supp.2d 904, 933 (D.Minn. 2008)(quoting United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993).

Mendez testified that he asked the Defendant specifically about his immigration status in addition to his other basic biographical information. It is evident from the record that the Defendant was suspected of immigration and possible criminal charges, and the questions during the first cell phone interview were not asked solely for routine booking reasons. Notably, at the time of the first cell phone interview Agent Mendez was not asking the Defendant about his immigration status for routine booking purposes, but because the Defendant was suspected of having provided a false name and of being in the country illegally. See United States v.

---

distinguishable from Johnson. In Johnson, even though the defendants' movement was restrained by virtue of the fact that they were placed in a squad car, their passengers remained at the scene, they affirmatively agreed to enter the squad, and they were specifically advised they were not under arrest. In the present case, the Defendant was not given a choice as to whether he would enter the squad car, and he was not advised that he was not required to answer questions or that he was not under arrest.

Mellado-Evanguelist, 2009 WL 161240 at *7 (D.Minn. Jan. 27, 2009)(exception did not apply, stating that "it is important that Agent Carey's questions were not part of any normal booking procedure."); United States v. Henley, 984 F.2d at 1042 ("When a police officer has reason to know that a suspect's answer may incriminate him . . . even routine questioning may amount to interrogation."); United States v. Ignacio-Lorenzo, 2011 WL 3511554 at *4 (D. Neb. July 14, 2011)(agents were required to comply with Miranda where they should have known that asking of country of origin and immigration status would elicit incriminating responses); compare, Ocho-Gonzalez, 598 F.3d at 1038 (because the defendant's name was never in doubt and was not related to any substantive offense, request for full name was not interrogation under Miranda); Accordingly, because the Defendant was subject to custodial interrogation without a Miranda warning, his telephonic statement to Border Patrol agents over a cell phone while in custody at the scene of the traffic stop should be suppressed.

Although the Court finds that the Defendant's first statement should be suppressed, the Court finds that none of the evidence that was obtained thereafter, including the Defendant's fingerprints, his second statement, and the database match, is subject to suppression as a fruit of the unwarned custodial interrogation. A voluntary but unwarned statement is not grounds for the suppression of "physical evidence that is the fruit of custodial interrogation conducted without Miranda warnings." United States v. Morse, 569 F.3d 882, 884 (8th Cir. 2009)(narcotics obtained after unwarned statement need not be suppressed)(citing United States v. Patane, 542 U.S. 630, 642-44 (2004)); United States v. Vallalba-Alvardo, 345 F.3d 1007, 1008 (8th Cir. 2003)("a Miranda violation does not demand the suppression of derivative physical evidence if the non-Mirandized statement was voluntary.") Here, Defendant has not argued, nor is there any evidence to support, that the Defendant's unwarned statement was not voluntary or that his will

was overborne. As such, the unwarned statement does not require the suppression of any subsequent evidence.

### C.   The Arrest

The Defendant argues that his arrest was unlawful because it was not supported by probable cause, and therefore, that any evidence obtained thereafter should be suppressed as fruit of the unlawful detention.

If a seizure or detention is unreasonable under the Fourth Amendment, "evidence obtained as a direct result" of the seizure, and evidence "later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree' must be excluded." Segura v. United States, 468 U.S. 796, 804 (1984). As pertinent here, statements obtained from an illegal detention are inadmissible. United States v. Flores-Sandoval, 422 F.3d 711, 714 (8th Cir. 2005).

"An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." United States v. Torres-Lona, 491 F.3d 750, 755-56 (8th Cir. 2007), cert. denied, 552 U.S. 1121 (2008). The court considers the totality of the circumstances based on the information available to the officers at the time of the arrest. United States v. Quiroga, 554 F.3d 1150, 1154 (8th Cir. 2009), cert. denied, 129 S.Ct. 2175 (2009).

Based on the totality of the circumstances, the Court finds that there was probable cause to arrest the Defendant on reasonable suspicion of being in the country illegally and of providing a false name to a peace officer. When the Defendant was initially questioned regarding his identity, pursuant to a valid traffic stop, the Defendant could not produce identification. When the multiple names, date of birth, and possible states of residence provided produced no

information on Defendant, Goman reasonably contacted Border Patrol, whose computer checks also produced no information on Defendant. At that point, Goman would have been justified in believing that the Defendant was attempting to conceal his true identity, and accordingly, he reasonably believed that the Defendant had provided a false name, which provided probable cause for an arrest. In addition, Border Patrol agents also reasonably believed that the Defendant might be in the country illegally. The Defendant was unable to produce identification, he provided three different names, and his identity could not be verified through any of the normal databases at the disposal of Border Patrol or Trooper Goman, based any of the information provided by the Defendant. As such, the Court concludes that there was probable cause to arrest the Defendant for suspected immigration charges and providing a false name.[5] See United States v. Quintana, 623 F.3d 1237, 1241 (8th Cir. 2010)(probable cause to make warrantless administrative arrest on suspicion that defendant was illegal alien where defendant's name, entry, and immigration status could not be verified through preliminary record checks). Therefore, none of the evidence obtained during his detention should be suppressed as fruit of an unlawful detention, including his second statement, the fingerprints and database results.

Lastly, the Court notes that the Defendant has not raised any other specific arguments with respect to suppression of the second statement he made at the Border Patrol Station. As already noted, the Defendant's arrest was not unlawful so his statement at the station is not subject to suppression as fruit of the poisonous tree. In addition, there is no evidence that the statement was taken in violation of Miranda, as the Defendant was advised of his Miranda rights both in English and in his primary language of Spanish. He indicated that he understood his

---

[5] The Court finds this to be true without consideration of the Defendant's statement that he was a LAPR, which was taken in violation of Miranda, as the Court has already concluded. Goman testified that Border Patrol had already asked that he be detained pending further investigation of his identity even before this statement was obtained.

16

rights, and there is no evidence that he asked to terminate the interview or asked for an attorney at any time during the interview. Moreover, the record is devoid of any evidence supporting an inference that the Defendant's will was overborne or that he was subject to coercive police conduct in making any incriminating statements. See United States v. Estey, 595 F.3d 836, 839 (8th Cir 2010)("'The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired."), cert. denied, 130 S.Ct. 3342 (2010).

Lastly, the Court finds no basis for excluding the Defendant's second statement simply because his earlier statement was obtained in violation of Miranda. The Court recognizes that when Miranda is intentionally violated for tactical reasons, postwarning statements that are related to the substance of prewarning statements must be excluded. See Missouri v. Seibert, 542 U.S. 600, 616-17 (2004); United States v. Torres-Lona, 491 F.3d 750, 758 (8th Cir. 2007), cert. denied, 552 U.S. 1121 (2008). Here, there is no evidence to reasonably support any conclusion that during the first interview over the cell phone law enforcement intentionally violated Miranda or engaged in the kind of dual interrogation methods that would require the second, post-Miranda statement to be suppressed. The statements were separated by many hours and took place at different locations, and they were not conducted by the same individuals. As such, there is no basis to exclude Defendant's second statement as a result of his earlier, unwarned statement.

### III.   RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 21] be DENIED;

2. Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 22] be GRANTED as to the telephonic statement he made at the scene of the traffic stop, but DENIED as to the statement made at the Border Patrol Station.

Dated: August 29, 2011
                                                    s/Leo I. Brisbois
                                                    LEO I. BRISBOIS
                                                    United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by September 12, 2011,** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.